UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KEITH L. CLOSSON,

                Plaintiff,

v.

CHERYL STRANGE,

                Defendant.

Case No. C24-5895-JCC-SKV

REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Plaintiff Keith Closson is in the custody of the Washington Department of Corrections ("DOC") and is currently confined at the Washington State Penitentiary in Walla Walla Washington ("WSP") – Intensive Management Unit ("IMU"). Plaintiff alleges in this action that his due process rights under the Fourteenth Amendment have been violated by Defendant's enforcement of DOC Policy 320.250, which governs maximum ("MAX") custody placements. Dkt. 18. This matter is now before the Court on Defendant's motion for summary judgment. Dkt. 21. Plaintiff has filed a response opposing Defendant's motion (Dkt. 27), and Defendant has filed a reply brief in support of her motion (Dkt. 29). The Court, having reviewed Plaintiff's amended complaint, Defendant's summary judgment motion, all briefing of the parties, and the

REPORT AND RECOMMENDATION
PAGE - 1

remaining record, concludes that Defendant's motion should be granted, and that Plaintiff's amended complaint and this action should be dismissed with prejudice.

## II. BACKGROUND

### A. DOC Policy 320.250

At issue in this action is DOC Policy 320.250, which governs MAX custody placements, transfers, and releases. *See* Dkt. 22. Ex. 1 (DOC 320.250). The policy sets forth guidelines for the demotion to, transfer between, and release from, MAX custody for DOC inmates who, among other things, "[p]ose a significant risk to the safety and security of employees, contract staff, volunteers, or other individuals[.]" *See id.*, Ex. 1 (DOC 320-250, Policy, I). The policy also applies to inmates who have validated protection needs and those with serious mental health issues. *See id.*

Referrals to MAX custody begin with an Ad Seg Hearing Officer who reviews all pertinent information, conducts a formal hearing, and makes a recommendation to the Superintendent/designee of the facility where the inmate being considered for MAX custody placement is housed. *See* Dkt. 22, Ex. 1 (DOC 320.250, Directive, III(A)). The Superintendent/designee reviews the recommendation and either approves or denies it. *See id.* If approved, the recommendation is sent to DOC headquarters for review by the Headquarters MAX Custody Committee. *See id.*

When the facility's MAX custody recommendation is received at headquarters, it is reviewed by a Corrections Specialist 4 who either concurs with the facility's recommendation or develops an independent recommendation. Dkt. 22, Ex. 1 (DOC 320.250, Directive, IV(A)). The Corrections Specialist's recommendation is to be based on information including the facility's recommended plan, active separation/prohibited placements, available facility beds,

and available programming on MAX custody. *See id.* The facility's recommendation and the Corrections Specialist's recommendation are then presented to the MAX Custody Committee, and chair of the Committee renders a final decision after receiving input from its other members. *Id.*, Ex. 1 (DOC 320.250, Directive, IV(B)). The policy affords inmates an opportunity to appeal the Committee's final decision to the Assistant Secretary of Prisons. *Id.*, Ex. 1 (DOC 320.250, Directive, IV(C)).

Among the considerations for the chair of the MAX Custody Committee in rendering a final decision on an inmate's MAX custody placement is the inmate's eligibility to progress through the various levels of the MAX custody system. *See* Dkt. 22, Ex. 1 (DOC 320.250, Directive, IV(B)(1)(c)). The MAX custody policy includes a level/step component which allows eligible inmates to promote to different program management levels/steps within MAX custody, with increased privileges at the various levels used as positive reinforcement. *See id.*, Ex. 1 (DOC 320.250, Directive, VI). There appear to be three levels generally available to MAX custody inmates. *See id.*, Ex. 1 (DOC 320.250, Directive, VII(B)).[1] However, the policy provides that an inmate may be eligible for "Level 2 only" placement if he is assigned to MAX custody for specified reasons, including assault with a weapon. *See id.*

Within ten business days of a MAX custody inmate's arrival at his assigned facility, employees at the facility are to identify the inmate's risks and needs and program expectations, and the assigned case manager develops a Behavior and Programming Plan ("BPP") which is then provided to the inmate. Dkt. 22, Ex. 1 (DOC 320.250, Directive, V(B), VII(A)(2)). Compliance with the BPP is a prerequisite to inmates being promoted to a higher level/step

---

[1] A review of DOC 320.250 suggests there may be a fourth level within the MAX custody system, though it appears level 4 may not be available to all MAX custody inmates but may, instead, be reserved for a smaller subset of such inmates. *See* Dkt. 22, Ex. 1 (DOC 320.250, Directive, VII(B)).

REPORT AND RECOMMENDATION
PAGE - 3

within MAX custody and to progressing out of MAX custody to a less restrictive custody level. *See id.*, Ex. 1 (DOC 320.250, Directive, VI(B)-(C), VII(B), IX(B)(2), (5)).

Classification reviews are conducted at regular intervals to assess an inmate's progress in meeting the specific criteria set forth in their BPP. Dkt. 22, Ex. 1 (DOC 320.250, Directive, X(A)). Informal classification reviews are held at least once every 60 days, and formal classification reviews are held at least once every 180 days. *Id.*, Ex. 1 (DOC 320.250, Directive, X(A)(1)-(2)). The reviews are conducted out-of-cell and focus on the specific behavioral expectations for the individual. *Id.*, Ex. 1 (DOC 320.250, Directive, X(A)). An inmate's progress in meeting the criteria set forth in the BPP is documented during each review period and, though such progress is to be considered in developing a plan for less restrictive housing, it will not necessarily result in a promotion. *See id.*

**B.     Facts**

Plaintiff has been in the custody of the DOC for over 30 years, pursuant to a 1993 conviction in Skagit County Superior Court on a charge of murder in the first degree. *See* Dkt. 23, Ex. 1. On July 1, 2024, Plaintiff was confined at the Washington Corrections Center ("WCC") when he assaulted another inmate, Sherman Pulley. *See id.*, Exs. 2, 8. An investigation into the incident revealed that Plaintiff approached Pulley from behind and stabbed him in the side of the neck with a "manufactured weapon." *See id.* Plaintiff was in possession of three weapons at the time of the assault, including a hard plastic pen in his right hand which he used to stab Pulley, a manufactured weapon which consisted of rolled papers with multiple razor blades fixed in the end in his left hand, and a manufactured weapon which consisted of a bar of soap in a sock found during a search of Plaintiff's person following the stabbing incident. *Id.* Pulley suffered a puncture wound, a laceration approximately a half inch in diameter, and a long

REPORT AND RECOMMENDATION
PAGE - 4

scratch into his hairline as a result of the attack. *Id*. The wound in Pulley's neck required sutures and bandaging by the WCC medical staff. *Id*. The assault occurred in a walkway outside a WCC dining hall and was witnessed by staff and captured on surveillance video. *See id.*

Following the incident, Plaintiff was transported to the WCC-IMU where he was placed in administrative segregation pending disciplinary proceedings. *See* Dkt. 23, Exs. 2, 3. On July 2, 2024, a serious infraction report was issued which accused Plaintiff of violating the following provisions of WAC 137-25-030(1): 602 ("Possessing, manufacturing, or introducing any firearm, weapon, sharpened instrument, knife, or poison, or any component thereof[.]"); 502 ("Committing aggravated assault against another incarcerated individual[.]"); 508 ("Spitting or throwing objects, materials, or substances in the direction of another person(s)[.]"); 717 ("Causing a threat of injury to another person by resisting orders, assisted movement, or physical efforts to restrain[.]"); and 709 ("Out-of-bounds: Being in another incarcerated individual's cell or being in a restricted or out of bounds area of the facility with one or more incarcerated individuals without authorization[.]"). *Id.*, Ex. 8.

A disciplinary hearing was held on July 10, 2024. Dkt. 23, Ex. 7. Though Plaintiff received notice of the hearing, he refused to attend. *Id*., Exs. 4, 5, 7, 8. The hearing officer found Plaintiff guilty of four of the five charged serious violations (602, 502, 508, and 717), and reduced one serious violation (709) to a lesser general violation under WAC 137-28-220(1), 210 ("Out of bounds: Being in an area where the presence of the incarcerated individual is unauthorized[.]"). *Id*., Exs. 7, 8. The hearing officer based his findings on the infraction report, the incident reports of staff, medical documentation and photos of Pulley's injuries, surveillance video, and photos of the manufactured weapons in Plaintiff's possession at the time of the

assault. *See id.* The hearing officer imposed a sanction of two years loss of weightlifting privileges. *See id.*

The day following Plaintiff's disciplinary hearing, July 11, 2024, a custody review was initiated, and on July 18, 2024, a Facility Risk Management Team ("FRMT") referred Plaintiff for MAX custody placement based on his violent institutional history, which included more than thirty prior maximum custody placements. *See* Dkt. 23, Ex. 9 at 29, Ex. 15 at 55; Dkt. 24, ¶ 7. The WCC classification team thereafter recommended that Plaintiff be transferred to the WSP-IMU for "Level 2 only" MAX custody placement and that a case manager develop a Behavior and Programming Plan ("BPP") for Plaintiff to complete prior to his release back into the general population. *See* Dkt. 23, Ex. 9 at 29; Dkt. 24, ¶ 8. The "Level 2 only" placement was recommended because Plaintiff used a weapon during the assault. *See id.* The Superintendent approved the recommendation, and the recommendation was thereafter sent to DOC headquarters for review and final approval. *See* Dkt. 23, Ex. 9 at 29.

On August 5, 2024, the Headquarters MAX Custody Committee adopted the recommendation that Plaintiff be demoted to MAX custody and transferred to the WSP-IMU. Dkt. 23, Ex. 9 at 29. The Committee also directed that Plaintiff's BPP be updated, that he be maintained on "Level 2 only" due to the use of a weapon during a violent incident, and that he complete programming as assigned by his case manager. *See id*. The Committee noted that Plaintiff had not demonstrated any long-term ability to refrain from extreme violence, that he presented a significant threat towards others, and that maximum custody was required to keep people safe. *See id.*, Ex. 9 at 29-30, Ex. 10 at 32, Ex. 11 at 35, Ex. 12 at 38, Ex. 14 at 46; *see also* Dkt. 24, ¶ 9. On August 9, 2024, Plaintiff prepared an appeal of the Committee's decision in which he challenged the "Level 2 only" designation and, in accordance with DOC policy, he

REPORT AND RECOMMENDATION
PAGE - 6

mailed the appeal form to the Assistant Secretary of Prisons the same day. *See* Dkt. 28 at 9 and ¶¶ 3, 4. According to Plaintiff, he never received a response to his appeal despite having sent three follow-up letters to DOC headquarters inquiring about the status of his appeal, letters which he claims also went unanswered. *See id.*, ¶¶ 5, 6.

Plaintiff was transferred to the WSP-IMU on August 14, 2024, for his MAX custody placement. Dkt. 25, ¶ 12. On August 21, 2024, a hearing was conducted to assess Plaintiff's risks and needs, and to develop his BPP. *Id*. Plaintiff was present at this meeting with members of the Multi-Disciplinary Team ("MDT"), which included his case manager, Robert Royse. *Id.* At that meeting, a BPP was developed that required Plaintiff to comply with the expectations detailed in the BPP, to not participate in security threat group activity, to attend all call-outs and multi-disciplinary teams, to remain serious and general infraction free, to maintain a clean cell and good personal hygiene, to review and comply with the offender handbook, to complete the cognitive behavior change program, and to complete Hustle 2.0 Preseason, Book One, and Book Two. *Id.*; Dkt. 23, Ex. 10. Plaintiff was advised he needed to kite the mental health staff to get on a waiting list for the cognitive behavior change program and he was given an application for the Hustle 2.0 books. *See id*. Plaintiff acknowledged that he understood the expectations of his BPP requirements. *Id*.

On October 2, 2024, an informal 60-day classification review was conducted to monitor Plaintiff's compliance with his BPP. Dkt. 23, Ex. 11; Dkt. 25, ¶ 13. Plaintiff was present at this hearing with members of the MDT. *See id.* Plaintiff's compliance was deemed poor at that time as he had not yet kited the mental health staff to get on the waiting list for the cognitive behavior change program, nor had he completed the Hustle 2.0 books. *See id*. Plaintiff was once advised that he needed to contact the mental health staff to get on the waiting list for the cognitive

REPORT AND RECOMMENDATION
PAGE - 7

behavior change program and that he had to complete the Hustle 2.0 books. *See id.* Plaintiff indicated that he understood the expectations of his BPP. *See id.*

On December 4, 2024, another informal 60-day review was conducted to monitor Plaintiff's compliance with his BPP. Dkt. 23, Ex. 12; Dkt. 25, ¶ 14. Plaintiff was present at this hearing with members of the MDT. *See id.* Plaintiff's compliance was once again deemed poor as he had still not kited the mental health staff to get on the waiting list for the cognitive behavior change program and nor had he completed the Hustle 2.0 books. *See id.* Plaintiff was again informed that he needed to accomplish these tasks, and he indicated again that he understood the expectations of the BPP. *See id.*

Plaintiff was also confronted by his case manager, Royse, about his continued procrastination in completing his BPP requirements which, according to Royse, Plaintiff had had ample time to do at that point. Dkt. 25, ¶ 15. According to Royse, Plaintiff indicated that he was not interested in completing his BPP requirements because he was more focused on litigating his civil rights action.[2] *Id*. Plaintiff was warned he could be demoted to Level 1 MAX custody for his continued non-compliance with his BPP. *Id*. Plaintiff thereafter kited the mental health staff, and, on December 11, 2024, Plaintiff was added to and began the cognitive behavior change program. *Id*., ¶ 16; Dkt. 23, Ex. 15 at 51.

On January 29, 2025, Plaintiff attended an administrative segregation FRMT as a part of a formal 180-day classification review. *See* Dkt. 23, Ex. 13 at 43, Ex. 15 at 50. Plaintiff indicated at that time that his work on the Hustle 2.0 Preseason book was ready to be picked up and that the reason his programming was taking so long was that he was also working on his federal lawsuit. *Id.*, Ex. 13 at 43. Plaintiff requested as a part of the review that he be promoted

---

[2] Plaintiff filed this civil rights action on October 21, 2024. *See* Dkt. 1.

REPORT AND RECOMMENDATION
PAGE - 8

to Level 3. *Id.* The FRMT recommended that Plaintiff be maintained on MAX pending his completion of all BPP expectations and that he also be maintained on "Level 2 only." *See id*., Ex. 13 at 43-44. On February 6, 2025, the Headquarters MAX custody MDT adopted the recommendation of the FRMT and maintained Plaintiff on MAX custody "Level 2 only" due to his use of a weapon during a violent incident. *Id*., Ex. 13 at 44.

Plaintiff completed the Hustle 2.0 Preseason book on February 18, 2025, and was issued Hustle 2.0 Book One on the same date. *See* Dkt. 23, Ex. 15 at 50. On March 7, 2025, Plaintiff completed the cognitive behavior change program and was issued a certificate of completion. *See id*., Ex. 15 at 49.

On April 2, 2025, another informal 60-day review was conducted. *See* Dkt. 23, Ex. 14; Dkt. 25, ¶ 20. While members of the MDT were present at the hearing, Plaintiff waived his attendance. *See id.* It was noted at that time that Plaintiff still needed to complete Hustle 2.0 Book One and Book Two. *See* Dkt. 23, Ex. 14 at 47. A week later, on April 9, 2025, Plaintiff submitted his work on Hustle 2.0 Book One for grading. *See id*., Ex. 15 at 49. According to Plaintiff, he did not receive the Hustle 2.0 Book Two until early June 2025. *See* Dkt. 27 at 10, Dkt. 28, ¶ 9. Because Plaintiff has not completed the requirements of his BPP, he is not currently eligible for promotion from "Level 2 only" MAX custody back to the general population. Dkt. 25, ¶ 21.

### C.  Plaintiff's Claims

Plaintiff alleges in this action that his right to procedural due process under the Fourteenth Amendment has been violated by DOC Policy 320.250, which restricts inmates such as himself who are assigned to MAX custody for assault with a weapon to placement on "Level

REPORT AND RECOMMENDATION
PAGE - 9

2 only." See Dkt. 7, Dkt. 18 at 4-6.[3] Plaintiff asserts that the policy generally permits inmates on MAX custody to "earn levels," and privileges consistent with those levels, through positive behavior, and he claims that restricting him to "Level 2 only" subjects him to conditions of confinement "that are significantly harsher than those enjoyed by inmates in general population at Washington State Penitentiary (WSP) as well as other inmates at WSP likewise confined on MAX custody who can aspire to and attain level 3." Dkt. 18 at 6-7.

Plaintiff goes on to assert that "the duration of my stay in segregation is to all appearance limitless," and he claims that "[t]his is borne out by the HQ MAX Custody Committee's decision which omits any suggestion of an exit strategy for me from MAX custody in this life of the next." Dkt. 18 at 8. Plaintiff alleges that this lack of an exit strategy, in combination with the harsh conditions that accompany his "Level 2 only" designation, imposes upon him "an atypical and significant hardship outside the realm of the ordinary incidents of prison life[.]" *Id.* Plaintiff further alleges that the procedures to obtain review of the "Level 2 only" designation are inadequate as, aside from the initial opportunity to appeal the MAX Custody Committee's decision, there are no procedures whereby he can seek review of his "Level 2 only" designation. *Id.*

Plaintiff identifies former DOC Secretary Cheryl Strange as the lone Defendant in this action. *See* Dkt. 18 at 1, 3. Plaintiff requests relief in the form of an injunction directing the Secretary of the DOC to adopt "adequate procedures whereby to protect [his] liberty interest in

---

[3] The Court notes that the operative complaint in this action is Plaintiff's amended complaint, filed on February 28, 2025 (Dkt. 18), and not Plaintiff's original complaint (Dkt. 7), which Defendant cites to in her summary judgment motion. Plaintiff's amended complaint differs from his original complaint only in that the amended complaint contains a request for nominal damages which the original complaint did not. *See* Dkts. 7, 18.

not being restricted to 'Level 2 only' on MAX custody indefinitely and without recourse." *Id*. at 9.

### III.  DISCUSSION

Defendant, in her pending motion for summary judgment, presents two bases for entry of judgment in her favor: (1) Plaintiff failed to exhaust his administrative remedies prior to filing this action; and (2) Plaintiff has suffered no constitutional violation. *See* Dkt. 21 at 12-16. Plaintiff argues in response that he has, in fact, exhausted his available administrative remedies and that there are material issues of fact which preclude entry of summary judgment for Defendant on his constitutional claim. Dkt. 27. Defendant has filed a brief reply in which she omits any reference to the exhaustion issue but reiterates her argument that she is entitled to summary judgment with respect to the substance of Plaintiff's constitutional claim. *See* Dkt. 29.

**A.  Applicable Standards**

  *1.  Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the non-movant's case, or by establishing that the non-movant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099,

1102 (9th Cir. 2000). The burden then shifts to the non-moving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the non-moving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the non-moving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

        2.     *Section 1983 Standard*

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show that (1) he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

**B.    Analysis**

        1.     *Exhaustion*

Section 1997e(a) of Title 42 of the United States Code provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Section 1997e(a) requires *complete* exhaustion through any available process. *See Porter v. Nussle* 534 U.S. 516, 524 (2002); *Booth v. Churner*, 532 U.S. 731, 739 (2001). Section 1997e(a) also requires *proper* exhaustion. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper" exhaustion means full compliance by a prisoner with all procedural requirements of an institution's grievance process. *See id*. at 93-95.

Failure to exhaust administrative remedies is an affirmative defense which a defendant must plead and prove. *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)). A defendant must produce evidence demonstrating that there was an available administrative remedy, and that the prisoner did not exhaust that remedy. *Id*. at 1172. The burden then shifts to the prisoner who must show that there is something in his case that made the existing remedies effectively unavailable to him. *Id*. If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment. *Id*. at 1166. However, "[i]f material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." *Id*.

The Ninth Circuit has recognized that acts by prison officials that prevent the exhaustion of administrative remedies may make administrative remedies effectively unavailable to a prisoner. *See Nunez v. Duncan*, 591 F.3d 1217, 1224-25 (9th Cir. 2010). Similarly, in *Ross v. Blake*, 578 U.S. 632 (2016), the United States Supreme Court held that § 1997e(a) requires an inmate to exhaust only those grievance procedures "that are capable of use to obtain some relief for the action complained of." *Id*. at 642 (citation and internal quotation marks omitted).

Defendant argues that Plaintiff failed to exhaust the administrative remedy available to him under DOC 320.250 when he failed to appeal the MAX Custody Committee's decision to assign him to "Level 2 only" MAX custody. Dkt. 21 at 13. Pursuant to DOC 320.250, an inmate who wishes to appeal a decision of the Committee must complete a DOC 07-037 Classification Appeal and submit it to the Assistant Secretary for Prisons/designee. Dkt. 22, Ex. 1 (DOC 320.250, Directive, IV(C)). Defendant maintains that Plaintiff did not complete the DOC Classification Appeal form and did not submit it to the Assistant Secretary for Prisons. *See* Dkt.

REPORT AND RECOMMENDATION
PAGE - 14

21 at 13. Defendant acknowledges Plaintiff's assertion in his pleading that he appealed the MAX Custody Committee's decision on August 9, 2024, in the manner prescribed, but argues that Plaintiff has provided no evidence to substantiate this assertion. *See id*.; *see also* Dkt. 18 at 6.

Plaintiff, in response to Defendant's exhaustion argument, argues that he did, in fact, exhaust the administrative remedy available to him by completing the requisite form and mailing it to the Assistant Secretary for Prisons within the requisite time period, though he claims he never received any response to his appeal from DOC officials. *See* Dkt. 27 at 4-6. Plaintiff submitted with his response to Defendant's summary judgment motion a declaration in which he states that after being notified of the MAX Custody Committee's decision on August 6, 2024, he obtained the DOC 07-037 form, completed it, and mailed it to the Assistant Secretary for Prisons in Olympia, Washington on August 9, 2024. *See* Dkt. 28, ¶¶ 2, 3, 4. Plaintiff attached to his declaration a copy of the DOC 07-037 form he maintains he submitted (*see id*. at 9), and he explains that he obtained the photocopy from his WCC-IMU case manager Brittany Machado on August 9, 2024, before mailing the original to the Assistant Secretary for Prisons (*see id*., ¶ 4). While Ms. Machado states in her declaration in support of Defendant's summary judgment motion that she does not recall providing Plaintiff with a photocopy of his appeal, she does not expressly deny having done so and Defendant, in her reply brief, does not challenge the authenticity of the appeal form attached to Plaintiff's declaration.

Plaintiff also avers in his declaration that after submitting his appeal he wrote three separate letters to DOC headquarters inquiring about the status of the appeal. Dkt. 28, ¶¶ 5, 6. Plaintiff attached to his declaration a page from his DOC "Chronos" (*see id*. at 10; *see also* Dkt. 23, Ex. 15 at 53), which shows that DOC headquarters received mail from him at a time

REPORT AND RECOMMENDATION
PAGE - 15

corresponding with the approximate dates he indicates he sent his letters of inquiry (*see id.*, ¶ 6). Plaintiff claims he never received any response to his letters of inquiry either, even though the Chrono page reflects that a response was provided. *See id.* at 10 and ¶ 6. While Plaintiff does not provide copies of the letters he states he sent to DOC headquarters to inquire about his appeal, Defendant does not challenge Plaintiff's representations in this regard and, indeed, does not address the exhaustion issue at all in her reply brief.

The evidence in the record demonstrates that Plaintiff attempted to exhaust his available administrative remedy by following the procedures set forth in DOC 320.250, but DOC never processed or responded to Plaintiff's appeal. The Court therefore concludes that Plaintiff has satisfied the exhaustion requirement of § 1997e(a).

### 2. Due Process

The Due Process Clause protects prisoners from being deprived of life, liberty, or property without due process of law. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974) (citations omitted). However, a due process claim under the Fourteenth Amendment can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). Prisoners generally have no constitutional right to a particular classification or custody level, *Hernandez v. Johnston,* 833 F.2d 1316, 1318 (9th Cir. 1987) (citing *Moody v. Daggett,* 429 U.S. 78, 88 n.9 (1976)), to remaining in general population, *see Sandin v. Conner*, 515 U.S. 472, 485-86 (1995), or to staying in a particular institution*, see Meachum v. Fano*, 427 U.S. 215, 225-27 (1976).

The Supreme Court has nonetheless held that a liberty interest in avoiding certain conditions of confinement may arise from state policies or regulations, though such interests are

generally limited "to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.  The Ninth Circuit has acknowledged that there is no single standard for determining whether certain conditions constitute an "atypical and significant hardship," but has identified three considerations that should guide the inquiry:

> 1) whether the challenged condition "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence.

*Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) (citing *Sandin*, 515 U.S. at 486-87). "If the hardship is sufficiently significant, then the court must determine whether the procedures used to deprive that liberty satisfied due process." *Id.* at 860-61.

In this case, Plaintiff does not allege that his assignment to MAX custody generally violated his due process rights, he alleges instead that his assignment to MAX custody with the attendant restriction to "Level 2 only" has deprived him of a liberty interest without proper protections.  Dkt. 18 at 5.  Plaintiff contends that restricting him to "Level 2 only" subjects him to significantly harsher conditions than those experienced by inmates in general population and those experienced by inmates confined in MAX custody who are able to advance to Level 3 during the course of their MAX custody placement. *Id*. at 7.  Plaintiff asserts that Level 3 MAX custody inmates are allowed televisions in their cells, $25 a week in food and beverages from the prison commissary, and tablets that permit them to place phone calls, send emails, play and purchase video games and music, and receive photos. *Id*.  Plaintiff asserts that Level 2 MAX custody inmates, in contrast, are allowed only a radio and $10 in commissary. *Id*.

REPORT AND RECOMMENDATION
PAGE - 17

Plaintiff maintains that the harsh conditions which accompany his "Level 2 only" designation, in combination with the apparently limitless duration of his confinement on MAX custody, impose upon him "an atypical and significant hardship." *Id*. Plaintiff acknowledges that protective custody inmates in MAX custody are also restricted to "Level 2 only," but he claims that his circumstances differ from such inmates because "protective custody inmates can finesse their release from segregation almost immediately should they so desire." *Id*.

Plaintiff's due process claim turns primarily on the duration of his confinement in MAX custody, which is now approaching one year. However, the evidence presented by Defendant in support of her motion for summary judgment refutes Plaintiff's suggestion that his MAX custody placement is indefinite. The policy Plaintiff challenges in this action, DOC Policy 320.250, provides Plaintiff an "exit strategy," one which requires that he comply with the requirements of his BPP. The record makes clear that Plaintiff, during his first several months in MAX custody, made no effort to comply with the requirements of his BPP. Plaintiff cannot simply refuse to comply with the procedures set forth in the policy for advancement to a more favorable custody level and then be heard to complain about the duration of his confinement under more restrictive conditions. Because the conditions of Plaintiff's confinement in MAX custody subject to "Level 2 only" restrictions appear to mirror those of individuals assigned to protective custody, and because the duration of Plaintiff's confinement on MAX custody is largely within his control, this Court concludes that Plaintiff has not demonstrated "an atypical and significant hardship" arising out of enforcement of DOC Policy 320.250.[4]

---

[4] To the extent Plaintiff complains that his case manager has interfered with his ability to fulfill the requirements of his BPP by failing to provide his final Hustle 2.0 book in a timely fashion (*see* Dkt. 27 at 10), Plaintiff's complaint exceeds the scope of this action. The single claim alleged in this action concerns the constitutionality of DOC Policy 320.250, as adopted and enforced by the Secretary of the DOC. Plaintiff's case manager is not a defendant in this action and, thus, his conduct in relation to the policy is not properly before this Court for adjudication.

Even assuming Plaintiff had demonstrated an "atypical and significant hardship" arising out of his restriction to "Level 2 only" MAX custody, DOC Policy 320.250, sets forth guidelines for inmates to advance out of MAX custody. As noted above, the policy provides that advancement to a more favorable custody level requires compliance with the BPP. The record makes clear that Plaintiff has been advised of the requirements of his BPP and that he is aware compliance with those requirements is necessary for advancement. The record also makes clear that Plaintiff has been afforded regular classification reviews, in accordance with the policy, to monitor his progress in relation to the requirements of his BPP. Once Plaintiff meets the expectations for a promotion out of MAX custody, he may seek such a promotion without delay. *See* Dkt. 22, Ex. 1 (DOC 320.250, Directive, VI(B)(1), X(A)(1)(a)).

Plaintiff suggests that there should be an additional set of procedures available to allow advancement from his "Level 2 only" designation to a higher level of MAX custody confinement – he apparently aspires to Level 3. However, Plaintiff fails to make clear what value these additional procedural safeguards would provide. The policy already provides regular reviews to monitor an inmate's progress towards satisfaction of the requirements of their BPP, and compliance with the BPP is a prerequisite to promotion either to another level within MAX custody or to a less restrictive custody level out of MAX custody. As Plaintiff, at least for many months, elected not to comply with his BPP, the lack of additional procedures would appear to have had no bearing on the duration of his confinement under the more restrictive conditions attendant to the "Level 2 only" designation.

In sum, Plaintiff has not demonstrated that enforcement of the challenged policy violated his Fourteenth Amendment rights. Accordingly, Defendant is entitled to summary judgment in this action.

REPORT AND RECOMMENDATION
PAGE - 19

## IV. CONCLUSION

Based on the foregoing, this Court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's amended complaint and this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit not later than **fourteen (14) days** from the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar **fourteen (14) days** from the date they are filed. Responses to objections may be filed by **the day before the noting date**. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **August 18, 2025**.

DATED this 28th day of July, 2025.

*S. Kate Vaughan*
S. KATE VAUGHAN
United States Magistrate Judge